**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Karen Judd, | No. CV-11-725-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Qwest Communications International Incorporated, Plan Administrator of the Qwest Disability Plan aka Qwest Communications International, | |
| Defendant. | |

Pending before the Court are motions for summary judgment filed by Plaintiff Karen Judd (Doc. 42) and Defendant Qwest Communications (Doc. 39). For the reasons stated below, the Court denies Plaintiff's motion and grants Defendant's.

**BACKGROUND**

Plaintiff Karen Judd worked for Qwest Communications for nearly five years as a Credit Consultant. (Doc. 42 at 4). She brings an ERISA action for denial of benefits against her former employer, as the ERISA Plan sponsor. (Doc. 44 at 4). Plaintiff contends that there is a "structural conflict of interest" in the relationship between her former employer and the third-party administrator (TPA) responsible for administering

the plan. (Doc. 41 at 5-6; Doc. 46 at 2–3). Plaintiff further argues that the decision to terminate her long-term disability (LTD) benefits was arbitrary and capricious, and therefore an abuse of discretion. (Doc. 42 at 2).

## I.      The Plan

Qwest Communications sponsors an ERISA Plan for its employees. (Doc. 44 at 4). The Plan is administered by Qwest Employee Benefits Committee (EBC), and provides that the EBC may delegate its responsibilities "by entering into a contract" for a third party to act as Plan administrator. (Doc. 40, ¶2). Since April 2004, EBC has contracted with a third-party administrator (TPA), Reed Group Ltd., operating as Qwest Disability Services. (*Id*. at 2). The TPA is not a party to this action, and the parties do not dispute that the plan administrator delegated responsibility to the TPA. (Doc. 44 at 2; Doc. 42 at 2–3).

## II.     Denial of Plaintiff's LTD Benefits

The parties dispute whether the decision to terminate Plaintiff's LTD benefits was arbitrary and capricious or otherwise an abuse of discretion. (Doc. 42 at 2). Ms. Judd has been variously diagnosed with mental health disorders including, *inter alia*, bipolar disorder, pathologic gambling and major depression recurrent, and has been prescribed multiple medications to address these issues. (Doc. 43, ¶5,7). She also has a history of substance abuse, including alcohol and methamphetamine abuse. (Doc. 43, ¶24; Doc. 40, ¶30; Doc. 44, ¶19).

On October 7, 2004, Ms. Judd "went out of work" and began to receive short-term disability (STD) benefits due to what was then labeled bipolar disorder. (Doc. 43, ¶3;

Doc. 41 at 2). Ms. Judd was hospitalized for a period in 2005 for severe depression. (Doc. 43, ¶6). In October 2005, Ms. Judd was awarded Social Security SSDI benefits, and the TPA was so informed. (Doc. 43, ¶¶8–9; AR000355). Also in October 2005, Ms. Judd was given a Global Assessment of Functioning (GAF) and achieved a score of 50. (Doc. 44, ¶8).[1]

Ms. Judd received 52 weeks of STD from the TPA, followed by another 40 months of LTD benefits. (Doc. 43, ¶4; Doc. 41 at 2).  Under the terms of the Plan, a participant, such as Plaintiff, who receives more than 12 months of LTD, is entitled to benefits if

> (1) the Participant is unable to engage in any occupation or employment, which inability is supported by Objective Medical Documentation, or (2) the Participant is unable to engage in any occupation or employment for which he may reasonably become qualified for by training, education or experience, other than a job that pays less than 60% of his Base Pay at the time the Participant terminates employment due to the Disability. (Doc. 40, ¶4).

Following an in-person examination and a file review by experts retained by the TPA, Plaintiff was denied continued LTD benefits on March 1, 2009. (Doc. 43, ¶4; Doc. 41 at 2). Following her denial of benefits and a substance abuse relapse, Ms. Judd was hospitalized again on June 8, 2009 for an attempted suicide. (Doc. 43, ¶24). Denial of

---

[1] Rated on a scale from zero to 100, the GAF is "used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health." Social Security Disability Law & Procedure in Federal Court § 5:30. "People with GAF scores of 41 to 50 have serious symptoms ... [or]   serious impairment in social, occupational or school functioning (e.g., . . . unable to keep a job)." *Id.* (internal citations omitted). "A GAF score between 51 and 60 indicates moderate symptoms, such as occasional panic attacks, while a score from 71 to 80 indicates transient reactions to normal stress, with only a slight impairment of functioning." *Gravatt v. Paul Revere Life Ins. Co.*, CV982166PHXROSOMP, 2005 WL 2789315, at *4 (D. Ariz. Oct. 25, 2005).

benefits was confirmed on appeal by the TPA on October 19, 2009. (Doc. 44 at 7).

## DISCUSSION

### I.   Legal Standard: *Abatie* Review

An ERISA denial of benefits challenge "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). *De novo* review "requires the district court to determine the presence of material facts in dispute, just as it does in other motions for summary judgment." *Parra v. Life Ins. Co. of N. Am.*, 258 F. Supp. 2d 1058, 1064 (N.D. Cal. 2003) *aff'd sub nom. Parrra v. CIGNA Group Ins.*, 81 F. App'x 932 (9th Cir. 2003) (citing *Tremain v. Bell Industries,* 196 F.3d 970, 978 (9th Cir. 1999)). Under *de novo* review, no deference is given to the administrator's decision to deny benefits. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 n.2 (9th Cir. 2010). *See also Firestone*, 489 U.S. at 115.

"[T]he standard of review shifts to abuse of discretion," however, when discretion has been granted to the administrator or fiduciary. *Abatie v. Alta Health and Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citing *Firestone*, 489 U.S. at 115); *See also*, *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110–11 (2008). "[F]or a plan to alter the standard of review from the default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Id.* at 963. (citing *Kearney*, 175 F.3d at 1090).

"Under the deferential abuse of discretion standard of review, 'the plan

- 4 -

administrator's interpretation of the plan will not be disturbed if reasonable." *Day v. AT & T Disability Income Plan*, __ F.3d __, 2012 WL 2550597 at *3 (9th Cir. July 3, 2012) (quoting *Conkright v. Frommert,* 130 S.Ct. 1640, 1651 (2010)). While the abuse of discretion review is a much more deferential standard, "'applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.' What deference means is that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 674–75 (9th Cir. 2011) (quoting *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010)). "[T]he test for abuse of discretion . . . is whether 'we are left with a definite and firm conviction that a mistake has been committed,' and we may not merely substitute our view for that of the fact finder." *Salomaa*, 642 F.3d at 676 (citing *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, . . . construe provisions of the plan in a way that conflicts with the plain language of the plan or rely on clearly erroneous findings of fact." *Day v. AT & T Disability Income Plan*, __ F.3d __, 2012 WL 2550597 at *3.   A court examines for abuse of discretion by considering "whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa*, 642 F.3d at 676. Where an administrator acts "arbitrarily and capriciously," it "thereby abuse[s] its discretion." *Id.* at 680. A reviewing court should weigh any conflict of interest as a factor in its review. *Glenn*, 554 U.S. at 108. Similarly, "[p]rocedural errors by the administrator are also weighed in deciding whether the administrator's decision was an abuse of

discretion," but "'a single honest mistake in plan interpretation' administration does not deprive the plan of the abuse of discretion standard." *Salomaa*, 642 F.3d at 674, (quoting *Conkright* 130 S. Ct. at 1649). "When an administrator can show that it has engaged in an "'ongoing, good faith exchange of information between the administrator and the claimant,' " the court should give the administrator's decision broad deference notwithstanding a minor irregularity."*Abatie*, 458 F.3d at 972.

## II.    Analysis

### A.    Discretion and Conflict of Interest

#### 1.    Standard of Review

To be reviewed under the abuse of discretion standard, "the plan must unambiguously provide discretion to the administrator." *Abatie*, 458 F.3d at 963 (citing *Kearney*, 175 F.3d at 1090). Here, both parties agree Reed/QDS is a third party administrator, upon whom the plan confers discretionary authority. (Doc. 41 at 5; Doc. 42 at 2). And, indeed, the contract between Defendant Qwest Communications and the TPA indicates that the TPA has the "exclusive right to exercise discretionary authority" under the plan, "including questions of eligibility, [and] interpretation of Plan provisions." (Doc. 40-1 at 3). *See Abatie*, 458 F.3d at 963 (holding where a plan delegates both the exclusive authority to interpret the terms of the plan and determine eligibility for benefits unambiguously "vest[s] discretion in the administrator"). Because the TPA has exclusive discretionary authority to interpret plan provisions and to determine eligibility, the Court reviews the denial of benefits under the abuse of discretion standard. *See Firestone*, 489

U.S. at 115.

### 2.    Structural Conflict of Interest

Courts have found a conflict of interest when an insurer both administers and funds an ERISA plan, as this creates a potential conflict between the duty to pay benefits to those who deserve them and, the duty to make profits for shareholders. *Abatie*, 458 F.3d at 966 (noting that where sponsor and administrator are the same entity there may be a desire to retain money in the sponsor's "own coffers" rather than pay out benefits). In contrast, Defendant has separated its role in funding the plan from that of the TPA, which administers the plan. Additionally, the contract between Qwest and the TPA not only compensates the TPA on a flat fee basis, but provides for an indemnification of Qwest by the TPA for ERISA breach of duty claims. (Doc. 40-1 at 6). The contract also provides that the TPA has no liability for paying benefits to participants. *Id*. Neither Plaintiff's arguments nor the Court's review of the administrative record reveal a structural conflict of interest.

Plaintiff also argues that the TPA fails to use "truly independent medical examiners." (Doc. 46 at 3–4). In support of her argument, Plaintiff argues that "[t]he U.S. Supreme Court and the lower appellate courts recognize that the opinions of consulting physicians that regularly contract with a long-term disability plan, as opposed to the opinions of treating physicians, may be tainted." (Doc. 42 at 9). Indeed, the Supreme Court has acknowledged "that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements." *Black & Decker Disability Plan v.*

*Nord,* 538 U.S. 822, 832 (2003). Plaintiff also points to a Sixth Circuit ruling, *Kalish v. Liberty Mutual/ Liberty Life Assur. Co. of Boston*, which found that an administrator which hires "experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that a claimant was not entitled to continued disability benefits.'" 419 F.3d 501, 507–08 (6th Cir. 2005) (internal citation omitted). Therefore, "although routine deference to the opinion of a claimant's treating physician is not warranted, we may consider whether a consultant engaged by a plan may have an incentive to make a finding of not disabled as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician." *Id.* (internal citations omitted). Similarly, "a conflicted plan administrator may find it advisable to bring forth affirmative evidence demonstrating 'that it used truly independent medical examiners or a neutral, independent review process; that its employees do not have incentives to deny claims; that its interpretations of the plan have been consistent among patients; or that it has minimized any potential financial gain through structure of its business.'" *Wallace v. Intel Corp.*, CIV.04-492 PHX RCB, 2006 WL 2709839 at *6 (D. Ariz. Sept. 20, 2006) (citing *Abatie,* 458 F.3d at 969, n. 7).

Unlike the situation in *Nord* and *Kalish*, however, in this case the Plan sponsor and the TPA are not the same entity. In *Wallace*, where the court found for the defendant plan sponsor, the court found that there was "scant evidence warranting great skepticism of the Administrator's decision," given that the administrator had delegated responsibilities to a

third party for claims administration under a flat rate fee system. *Wallace*, 2006 WL 2709839 at *8. Here, as in *Wallace*, there is a separation between the plan sponsor and the TPA which administers the claims. Additionally, the TPA is paid via a flat rate fee system, tempering any financial incentive on the part of the TPA to deny otherwise worthy claims.

Moreover, Qwest has affirmatively stated that the doctors in question are not employees of the TPA, but rather "independent expert[s] retained by [the TPA] to conduct a peer review of the work of [Plaintiff's] treating [physicians], and to examine the other medical records in [Plaintiff's] file." *Kalish*, 419 F.3d at 507. Despite the availability of limited discovery on the question of a conflict of interest, Defendant has not produced any evidence to the contrary. While the plan administrator "may bring forth evidence" showing there is no "taint," this does not imply that the administrator must do so, particularly where "[t]here is no evidence that [the TPA] attempted to tamper with or inappropriately influence [these physicians'] evaluation[s]." *Id.* Indeed, the TPA retained Dr. Willson for all three of Plaintiff's in-person exams, despite Dr. Willson's findings in 2006 and 2007 that Plaintiff remained disabled. Only when Dr. Willson found Plaintiff's condition had improved to GAF ranges within working capacity did the TPA deny Plaintiff's continued LTD benefits.

Thus, as in *Kalish*, Plaintiff "has offered only conclusory allegations of bias" with regard to the physicians in question. *Kalish*, 419 F.3d at 508. Absent evidence to support the allegations of bias, "we are unable to conclude . . . that [the TPA] acted arbitrarily and capriciously in deciding to credit the opinion of [their physicians] over that of [Plaintiff's

treating physicians].” *Id*. “The absence of such evidence weighs in favor of the Court's reviewing the Administrator's decision with a low level of skepticism.” *Wallace*, 2006 WL 2709839 at *8 (citing *Abatie*, 458 F.3d at 968).

### B.     Plan Interpretation

Judd argues that the TPA construed the Plan in a way that conflicts with its plain language by not considering the possible future deterioration of her mental health condition.

Dr. Willson, who conducted independent medical examinations of Ms. Judd, noted that Ms. Judd's “history of poor psychiatric mood control and medical problems could suddenly change her status, as could sudden environmental setbacks related to lifestyle.” (Doc. 46 at 7–8). Plaintiff argues that this means that she is unable to “sustain gainful employment on a continuous basis.” *Id.* Plaintiff relies on *Gatliff v. Commissioner of the Social Security Administration*, for the proposition that “substantial gainful activity means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time.” 172 F.3d 690, 694 (9th Cir. 1999).[2] Given the possibility of future set-backs, Plaintiff argues she is unable to sustain

---

[2] Plaintiff also cites to *Peterson v. Federal Express Corp. Long Term Disability Plan*, which states that “a total-disability determination cannot reasonably hinge on whether an employee is minimally capable, on a good day, at the right hour, of fulfilling her job duties in barely tolerable fashion.” CV-05-1622-PHX-NVW, 2007 WL 1624644 at *34 (D. Ariz. June 4, 2007). However, this statement was one of six rationales offered for overturning a plan administrator's decision. Made without citation or attribution, it was given in the context of a moderate level of scrutiny, due to several factors that warranted less deference to the administrator's decision. Those factors are not present here, where we only review for clear error under the traditional deferential abuse of discretion standard.

gainful employment and should, therefore, be considered disabled under the ERISA Plan.

Plaintiff's reliance on *Gatliff*, however, is misguided. First, the facts are very different. In *Gantliff*, the plaintiff was a severely mentally impaired individual who had a 15-year record of attempting to work. Unfortunately, because of his mental limitations, Mr. Gantliff was unable to maintain any of the 20 to 30 jobs he obtained for more than a few short months. *See generally, Gonzales v. Astrue*, 1:10-CV-00657-SKO, 2011 WL 4500838 (E.D. Cal. Sept. 27, 2011) (reviewing facts and scope of *Gatliff* holding). In contrast, here Ms. Judd does not have a multi-year history of trying and failing to support herself, but rather a multi-year history of being supported by ERISA benefits. Ms. Judd is arguing that the Court should apply an ex post holding to her situation ex ante. If Ms. Judd's logic were applied, any one-time ERISA claimant, otherwise able to work, whose symptoms may possibly recur at some indeterminate and unspecified point in the future, would be eligible for continued disability benefits. This proves too much. *See also Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir. 2004*)* ("That a person has a true medical diagnosis does not by itself establish disability."); *Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 943 (D. Ariz. 2010), *reconsideration denied in part* (Mar. 30, 2010) ("[A] mere diagnosis of a condition . . . is not determinative of disability for purposes of ERISA disability benefits.")

Second, Plaintiff asks this court to apply *Gatliff* out of context. *Gatliff* is a social security case; social security disability cases use a different standard of disability than ERISA plans. ERISA, unlike the Social Security Act, does not have a single inflexible

- 11 -

national standard. Rather, ERISA, was developed to give employers flexibility in designing their voluntary disability programs. *Nord*, 538 U.S. at 833. For this reason, "'[t]he validity of a claim to benefits under an ERISA plan,' on the other hand, 'is likely to turn,' in large part, 'on the interpretation of terms in the plan at issue.'" *Id.* (quoting *Firestone Tire*, 489 U.S. at 115). Here, the relevant Plan terms are that

> Disability means (1) the Participant is unable to engage in any occupation or employment, which inability is supported by Objective Medical Documentation, or (2) the Participant is unable to engage in any occupation or employment, for which he may reasonably become qualified for by training, education or experience, other than a job that pays less than 60% of his Base Pay at the time the Participant terminates employment due to the Disability.

(Doc. 30-1 at 9). Defendant, through a vocational assessment, has identified several positions which provide more than 60% of her Base Pay at the time she left on disability and in which Plaintiff, can engage given her current medical restrictions. The TPA has not abused its discretion in interpreting the plan; nor will the Court will read into the Plan a requirement that is not there.

In the absence of a clear conviction that the administrator has abused its discretion, "the plan administrator's interpretation of the plan will not be disturbed." *Day v. AT & T Disability Income Plan*, -- F.3d --, 10-16479, 2012 WL 2550597 at *3 (9th Cir. July 3, 2012) (quoting *Conkright v. Frommert,* 130 S. Ct. 1640, 1651 (2010)).  Here, the administrator has provided reasons for its decision, and has neither misconstrued the provisions of the Plan, nor relied on clearly erroneous findings of fact. *Id.* The Court, therefore, "respect[s] the discretionary authority conferred on ERISA fiduciaries." *Glenn*,

554 at 120 (Roberts, C.J. concurring).

### C.    Procedural Claims Under the Abuse of Discretion Review

Plaintiff alleges three procedural violations, which she claims show that the administrator abused its discretion. Plaintiff asserts that the administrator (1) failed to credit the opinions of her treating physicians, (2) did not take the Social Security Administration's (SSA) finding of disability into account, and that (3) the vocational assessment it commissioned was arbitrary and capricious.

### 1.    TPA's Deference to Plaintiff's Treating Physicians' Opinions

Plaintiff claims that the TPA did not properly credit the opinions of her treating physicians. (Doc. 42 at 7–8). "Nothing in [ERISA] itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Nord*, 538 U.S. at 831. However, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

Plaintiff asserts that her treating "physicians agree that she is totally disabled and unable to work." (Doc. 42 at 7). However, this is not true. While Plaintiff's arguments rely upon the opinions of Dr. Koelsch and Ms. Todd, neither of these providers was treating Plaintiff in the period immediately preceding the denial of benefits. In fact, at the time of the denial of benefits, Ms. Judd was being treated by medical professionals at JFCS. Throughout the multiple visits Ms. Judd paid to JFCS in the period from March 2008 to March 2009, three different JFCS providers noted GAF scores in the 60s, within

- 13 -

the range of those capable of working. (Doc. 44 at 8). Furthermore, the record clearly shows that the opinions of all Ms. Judd's treating physicians were included in the review of over 60 medical visits and observations made throughout the course of Ms. Judd's disability.

The administrator's conclusion, therefore, did not fail to credit the opinions of Plaintiff's treating physicians. Absent a conflict of interest, "the existence of a single persuasive medical opinion supporting the administrator's decision can be sufficient to affirm" the administrator's decision. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009). Here, the notes of the treating providers at JFCS reasonably support such a finding. Given these notes, the improvements noted by Dr. Willson and the file reviews conducted by independent medical experts, the administrator could reasonably conclude that Ms. Judd was capable of working. Therefore, the Court does not find that the plan administrator's decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676.

## 2.    Vocational Assessment

Plaintiff argues that the TSA is contradicted by her physicians' assessment that she is "unable to engage in any full time, competitive occupation on a continuous basis as indicated by their continual statements that her disabling conditions are permanent." (Doc. 42 at 11). As noted above, however, Ms. Judd's physicians' opinions do not consistently reflect an opinion that she is unable to engage in an occupation. Instead, the record shows progressive improvement, particularly as noted in her GAF scores over the

1  four-year period in question.

2      Plaintiff also argues that Dr. Willson stated that Ms. Judd could only return to

3  part-time employment, (Doc. 42 at 12), and therefore a TSA based upon this assessment

4  is arbitrary and capricious. However, Plaintiff references Dr. Willson's August 2007

5  report. (Doc. 31-3 at 31–34). The 2007 report found that Plaintiff was "not totally

6  disabled" but did not recommend a return to full-time employment. *Id.* Dr. Willson's

7  2008 report, however, noted improvement and stated that she "did not find evidence of

8  psychological or cognitive disability" at that time. (Doc. 31-3 at 14–15).  Dr. Willson

9  noted that while Plaintiff "would need to have a clear task with specific steps towards a

10  predictable goal, and a clear chain of command with only moderate interpersonal skills,"

11  she was capable of a return to full-time work, following a training and phase-in period of

12  a month. *Id.* Therefore, the TSA, which was based upon Dr. Willson's updated 2008

13  assessment, and not Dr. Willson's 2007 assessment, was not arbitrary and capricious.

14      The notes of Plaintiff's treating medical providers at JFCS, along with those of Dr.

15  Willson, indicate a patient with mental health issues, but not issues that are severe enough

16  to preclude Ms. Judd from "engag[ing] in any occupation or employment."  As noted

17  above, JCFS was the treatment provider for Plaintiff in the period immediately preceding

18  the denial of benefits. And, over the course of half a dozen visits, providers at JFCS

19  consistently noted GAF scores in the 60s. (Doc. 44 at 8). "GAF scores in the 60s are 'not

20  incompatible with work capacity.'" (Doc. 45 n. 2, citing AR001841). Dr. Willson's 2008

21  assessment and that of the file reviewers bore out this assessment.

22      Plaintiff further argues that the TSA is arbitrary and capricious because it lists

positions requiring customer service or interpersonal interaction. Plaintiff asserts that she "can no longer be in any occupation that requires customer service or interpersonal interaction of any kind." (Doc. 42 at 11). Plaintiff asserts too much.

Some of Plaintiff's examining physicians and file reviewers have noted that Ms. Judd "is easily irritated by other people's neediness or what may seem like personal demands, so primary customer service jobs would be contraindicated." (Doc. 43, ¶6). However, the denial of benefits letter included options, such as a data entry clerk or a word processor, which require limited or no customer service interaction. (Doc. 43, ¶42, 43; Doc. 44 at 14). Similarly, some of Ms. Judd's reviews noted that she "should be restricted to work responsibilities that are consistent with low interpersonal demands." (Doc 43, ¶31). Plaintiff, however, interprets this to mean that she should be limited to "no personal interaction of any kind." (Doc. 42 at 11).

Under an abuse of discretion review, the Court is required to uphold the plan administrator's decision if it is reasonable. *Conkright*, 130 S. Ct. at 1651. Here, the findings of Ms. Judd's own treating physicians at JFCS, together with that of the TPA's retained medical experts support a finding that Ms. Judd can return to work. These findings appear to have been taken into consideration in the TSA. TPA's decision was not, therefore, "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676.

### 3.    TPA's Consideration of Plaintiff's SSDI Benefits

Finally, Plaintiff argues that Ms. Judd's SSDI benefits were not considered in making the benefits decision. (Doc. 42 at 10–11). There is no indication that the TPA or

its retained experts specifically considered the SSA's determination in Ms. Judd's case. However, such a procedural error alone does not lead the Court to conclude the administrator acted "illogically, implausibly or without support in inference that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676.

Any Social Security Administrator's contrary determination should be considered as a factor in an ERISA plan's decision to deny benefits. *Montour*, 588 F.3d at 635. "While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process. In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence." *Id.* at 635 (citing *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006); *Glenn*, 554 U.S. at 123). "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." *Id.* at 636. *See also Salz v. Standard Ins. Co.*, 380 F. App'x 723, 724 (9th Cir. 2010). ("A proper administrative process will meaningfully discuss a claimant's award of social security benefits . . . [and] analyz[e] the distinctions between the basis for the two awards"). "[R]egulations promulgated by the Secretary of Labor authorize, if not require, plan administrators working with an apparently deficient administrative record to inform claimants of the deficiency and to provide them with an opportunity to resolve the problem by furnishing the missing information." *Montour*, 588 F.3d at 636 (citing 29 C.F.R. § 2560.503-1(f)(3)-(4), (g)(1)(iii)). "[E]ven under a

traditional abuse of discretion standard," failure to consider the SSA determination or to request information about it is a procedural error on the part of the TPA. *Kludka*, 454 F. App'x 611, 612–13 (9th Cir. 2011).

Here, other than a bare mention that Plaintiff is receiving SSDI, there is no mention in the record indicating that the reviewers or the TPA took the SSA's 2005 decision awarding benefits into account. (Doc. 31-1 at 61). Nor does the fact that the SSA uses a different methodology "alone . . . provide a basis for disregarding the SSA's determination." *Montour*, 588 F.3d at 636.  Even if the administrator did not have a copy of the opinion accompanying the SSA's award, the administrator "still was well aware of the uniform federal standard that applies to Social Security claims" *Id.* (Citing *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2006)).

"Procedural errors by the administrator are . . . weighed in deciding whether the administrator's decision was an abuse of discretion." *Salomaa*, 642 F.3d at 674. However, "a single honest mistake in plan interpretation administration does not deprive the plan of the abuse of discretion standard." *Id.* (internal citations omitted). Rather, all the factors must be weighed and considered together. *Montour*, 588 F.3d at 637.

Courts which have addressed this issue have typically remanded based on a multiplicity of factors, in combination with a failure to consider SSDI benefits. *See generally Kludka v. Qwest Disability Plan*, CV-08-01806-PHX-DGC, 2012 WL 1681983 at *9-10 (D. Ariz. May 14, 2012) (analyzing recent Ninth Circuit opinions related to administrator's abuse of discretion and concluding that typical Ninth Circuit cases which address this issue involve a multiplicity of factors in combination with a failure to

consider SSDI benefits). Thus, for example, in the Supreme Court's *Glenn* decision, "the Court considered the insurer's dual-role conflict of interest as one of a combination of factors," including the administrator's failure to weigh the Plaintiff's SSDI decision. *Brown v. Hartford Life Ins. Co.*, 428 F. App'x 817, 820 (10th Cir. 2011) Likewise, in the Ninth Circuit's *Montour* decision, failure to consider the SSDI award was only one of several issues which led the court to conclude there had been an abuse of discretion. 588 F.3d at 637 ("failure to explain why it reached a different conclusion than the SSA is *yet another factor* to consider in reviewing the administrator's decision for abuse of discretion") (emphasis added). In this District, this has led this Court to conclude, "*Montour* does not, however, resolve the issue" of a non-conflicted administrator which neglected to review a claimant's SSDI benefits. *Kludka v. Qwest Disability Plan*, 2012 WL 1681983 at *9.

Unlike the typical cases, these other factors do not present themselves here. Unlike the administrators in *Glenn, Montour* and *Brown*, the TPA is not a structurally conflicted administrator. Unlike the Plaintiff in *Montour*, who regularly kept the plan administrator informed of his SSA status and forwarded his SSA determination, there is no evidence that Ms. Judd did the same for the TPA. *Montour*, 588 F.3d at 635, 637; *See also Salomaa*, 642 F.3d at 676 (noting that claimant provided administrator with the SSA award, which was disregarded). Unlike *Montour*, where the administrator only conducted a "pure paper" review without an in-person evaluation of the claimant, here the TPA conducted multiple in-person examinations of Plaintiff. *Id.* at 634. *See also Saffron*, 552 F.3d at 869 (same).

1        There is no evidence suggesting that the TPA's reason for denial shifted over

2   time. *See Salomaa*, 642 F.3d at 676. There is no evidence that the TPA failed to obtain

3   and request medical records documenting Plaintiff's condition. *See Booton v. Lockheed*

4   *Medical Ben. Plan*, 110 F.3d 1461, 1464 (9th Cir. 1997). There is no record that the TPA

5   denied benefits subsequent to a near-contemporaneous contrary SSA determination.

6   *Glenn*, 554 U.S. at 188. Put simply, this case is unlike other cases where the

7   administrators made multiple procedural errors and had conflicts of interest warranting an

8   moderate level of scrutiny. This case involves only "a single honest mistake": the failure

9   to address a four year-old SSA determination, made in a period when Plaintiff's doctors

10  still consistently opined that she was unable to work. *Salomaa*, 642 F.3d at 674.

11       The parties have not indicated, and the court's own research has not discovered,

12  any Ninth Circuit precedent dealing directly with a non-conflicted administrator that has

13  failed simply to consider a contrary SSA determination in its benefits review. However,

14  in *Brown v. Hartford Life Ins. Co.*, the Tenth Circuit considered a case with only two

15  factors: a structurally conflicted administrator's mere failure to consider a contrary SSA

16  determination. 428 F. App'x 817 (10th Cir. 2011). In *Brown*, the court found that the

17  conflicted administrator had "taken steps to reduce potential bias and to minimize any

18  conflict of interest." *Id.* at 821. The steps included, for example, "separating the initial

19  claims handler from the appeals specialist, paying a fixed salary to its decision makers

20  without incentives for denying claims, and separating the financial department from the

21  claims department such that the claims handlers do not interact with the underwriters or

22  financial department in the handling of a claim." *Id.* Given these precautions to prevent

its structural conflict from impacting how it administered the plan, the *Brown* court found that a "Plan administrator's failure to distinguish or discuss the SSA's . . . findings of disability does not weigh heavily against [the administrator]." *Id.*

*Brown* is directly on point. There, looking only at the two factors of conflict of interest and the procedural error of failing to address the SSA's contrary findings, the court found the error was not such that it rose to an abuse of discretion. *Accord*, *Conkright v. Frommert*, 130 S. Ct. 1640, 1643 (2010) ("'one-strike-and-you're-out' approach has no basis in *Firestone*"). Here, the TPA made a similar error. Moreover, the TPA is not structurally conflicted, as the *Brown* administrator was. Weighing the factors discussed, this Court is not "left with a definite and firm conviction" that the TPA made a mistake in denying Ms. Judd's benefits. *Salomaa*, 642 F.3d at 676.

## CONCLUSION

For the forgoing reasons, the Court holds that the decision of the TPA was neither "illogical, implausible" nor "without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676. While the TPA should have considered Plaintiff's SSDI benefits, *Glenn*, 554 U.S. at 109, the Court does not find that this rises to the level of an abuse of discretion where there is no structural conflict of interest, and where the administrator has otherwise conducted a full and fair review of a very extensive medical record. Weighing all factors discussed above, the Court is not "left with a definite and firm conviction that a mistake has been made." *Salomaa*, 642 F.3d at 676. Thus, Defendants are entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Plaintiff Judd's Motion for Summary Judgment (Doc. 42) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 39) is **GRANTED** and the Clerk of the Court is directed to terminate this action.

Dated this 28th day of August, 2012.

_____

G. Murray Snow

United States District Judge